IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

T.W. VENDING, INC. and
THREE SQUARE MARKET, INC.,

          Plaintiffs,

v.

COD FOOD SERVICES, et al.

          Defendants.

ORDER

17-cv-529-slc

---

Before the court are three different discovery disputes and the parties' proposed stipulation to extend the schedule, which the court will address in order:

**I. Re-designating Confidential Documents (dkt. 14)**

As part of their November 6, 2017 motion to compel (dkt. 14), plaintiffs asked the court to order defendants to downgrade specified documents (dkt. 18-17) from "Attorney's Eyes Only" (AEO) to "Confidential." Plaintiffs argued that defendants had overused and misused the designation, which hampered plaintiffs' ability to develop their evidence. In their written response, defendants conceded nothing, claiming that they had limited their use of the AEO designation to their most sensitive business documents, and that the percentage of documents they marked AEO was both relatively small and proportional to the percentage of AEO documents marked by plaintiffs. Dkt. 23. At the November 15, 2017 telephonic motion hearing, the parties agreed that they could honor the existing AEO designations while taking their upcoming depositions, but they still needed the court to review the disputed documents to determine whether any of them should be dropped to simple "confidential," which would give the parties themselves access to the information. *See* hearing transcript, dkt. 56 at 20.

In their protective order, the parties use the "confidential" level of protection to protect information within the scope of F.R. Civ. Pro. 26[c]. The parties then provided that:

> A party may designate especially sensitive Confidential documents or portions of documents as "Confidential– Attorneys' Eyes Only" where disclosure of the document or portion of the document to the opposing party is likely to cause undue harm to the producing party or to the legitimate interests of a non-party.

Dkt. 13 at ¶ 5.

Although this court has a duty to the public to scrutinize first level protection, namely the parties's definition of "confidential" information, *see Jepson, Inc. v. Makita Elec. Works, Ltd.*, 30 F.3d 854, 859 (7th Cir. 1994), once this is done, the parties are free to impose whatever additional levels of protection they wish on any subset of information that objectively qualifies as confidential. In other words, the parties' definition of AEO level protection governs the court's review of the disputed documents in dkt. 18-17. The parties' protective order further provides that a party asserting that material qualifies for AEO protection "shall also have the burden of proving that there are not feasible, less restrictive means of providing the necessary protection." Dkt. 13 at ¶ 12.

Therefore, pursuant to ¶ 12, defendants have the burden of proving that AEO-level protection of a document is necessary to prevent undue harm to them or to the legitimate interests of a non-party. Absent a definition of the term "undue harm" in the protective order, I will default to a dictionary definition: "undue" means "unwarranted or inappropriate because excessive or disproportionate." *[Http://en.oxford](Http://en.oxford)dictionaries .com/definition/undue*. Defendants' responded to plaintiffs' AEO challenge in their Combined Memorandum:

> The documents that Defendants have marked as AEO contain sensitive and secret information regarding Defendants' financial information, marketing strategy, pricing information, technical information, and customer information. . . . Plaintiffs do not suffer any particular prejudice or hardship by being required to view such documents only through counsel. . . .

2

> Sterling Services had a strained and challenging business relationship with Plaintiffs due to the multiplicity problems [*sic*] plaguing Plaintiffs' kiosk software. And Plaintiffs are competitors of Digital Checkouts in the marketplace. Defendants should not be forced to turn over wholesale their sensitive information to Plaintiffs. An AEO designation, as stipulated by the parties' joint protective order, is an appropriate safeguard and should remain in place.

Dkt. 23 at 21.

Given that it is defendants' burden to establish, document-by-document, that each of these documents is entitled to AEO protection, this is argument is so vague as to be useless. I have read and reviewed each document filed at dkt. 18-17, and for most of them, I cannot discern any reason to conclude that allowing plaintiffs to see them would cause *any* actual harm to defendants, let alone harm that is "disproportionate" or "excessive." Most of the documents do not contain any sensitive financial or business information and they do not reveal any facts, circumstances or situations that would qualify for anything exceeding garden variety confidentiality. The bottom line: defendants have not established that *any* of the withheld documents qualify for AEO status. Accordingly, I intend to strip all of these documents of AEO protection.

Before I do, I will give defendants one more opportunity actually to meet their burden on a subset of documents that arguably could qualify for AEO protection. This will require defendants to provide specific, objective information about each of these documents (from dkt. 18-17, listed by Bates Number): 1441, 1475, 1611, 1653-58, 1661-70, 1672-78, 1690-1704, 1705-21 and 1728. Defendant may have until April 23, 2018 to submit ex parte a specific explanation as to why each of these documents actually qualifies for AEO protection.

## II. Defendant Bishop's Proposed Deposition Errata

On November 17, 2017, defendant Jim Bishop sat for a day-long deposition. *See* transcript, dkt. 40-4. On January 3, 2018, Bishop, by counsel, submitted a three page errata sheet offering 17 changes to his testimony, most on the ground that the proposed change was a "more accurate description of the events." *See* dkt. 40-5. This led to plaintiffs' motion to strike the errata (dkts. 38-40), which defendants oppose (dkt. 47).

Plaintiffs characterize Bishop's changes as blatant contradictions of his deposition testimony that cannot plausibly be seen as correcting an error or clarifying confusing testimony. Rather, assert plaintiffs, "The errata sheet changes contort every piece of testimony Bishop advanced regarding his assumed, believed and perceived ownership interest in ART and Digital." Dkt. 39 at 1.

Not so fast, counter the defendants: F.R. Civ. Pro. 30(e) *allows* Bishop to change the substance of his testimony, which he has appropriately done in order to clarify his testimony on one or two issues that were twisted by "opposing counsel's repetitive and manipulative questioning." Dkt. 47 at 1.

In the context of summary judgment, the Court of Appeals for the Seventh Circuit has held that the only circumstances in which a party may submit an affidavit that conflicts with his earlier deposition testimony is if it is based on newly discovered evidence, or if clarifies ambiguous or confusing deposition testimony. *Adelman-Tremblay v. Jewel Companies, Inc.*, 859 F.2d 517, 520 (7th Cir. 1988). In *Adelman-Tremblay*, the court found that the deponent's deposition testimony "was a model of clarity" that his subsequent affidavit directly contradicted. Accordingly, the deponent's affidavit was a nullity. *Id.* The court in *Thorn v. Sundstrand Aerospace Corp.*, 207 F.3d 383 (7th Cir. 2000) reached the same conclusion regarding Rule 30(e) errata. The court, while noting that the rule by its terms allows altering the substance of a deposition, held that "a change of substance which

4

actually contradicts the transcript is impermissible unless it can plausibly be represented as the correction of an error in the transcription, such as dropping a 'not.'" *Id.* at 389.

As subsequent courts have noted, however, this prohibition against substantive changes to deposition testimony applies in the narrow context of opposing summary judgment with the equivalent of a "sham affidavit." *See, e.g., Arce v. Chicago Transit Authority*, 311 F.R.D. 504, 509-10 (N.D. Ill. 2015). When we get to that point in this lawsuit, then defendants will not be allowed to support or oppose any summary judgment motion with any of Bishop's errata that contradict his deposition testimony. *Id. See also United States ex rel. Robinson v. Indiana Univ. Health Inc.*, 204 F.Supp.3d 1040, 1042-43 (N.D. Ind. 2016)("changing a deposition from what one said to what one meant is permitted by Rule 30(e), questionable though such a change may be. What is impermissible is for a party to attempt to rely upon such bald changes to defeat summary judgment."), citing *Thorn*, 207 F.3d at 388. So, there is no basis for the court to "strike" Bishop's proposed changes, now or ever.[1]

This is not an endorsement of the changes that Bishop offers as purported *errata* pursuant to Rule 30(e). Notwithstanding defendants' characterizations of Bishop's changes as "clarifications," Bishop has engaged in a testimonial version of buyer's remorse in which he is changing his testimony to better fit the narrative that defendants are offering in this lawsuit. But plaintiffs are asking for the wrong type of relief at the wrong time in this lawsuit. Bishop's original sworn deposition testimony remains in the record to be used as appropriate and necessary later in this case, most probably at the summary judgment phase and perhaps again at trial.

Finally, if plaintiffs believe that they need to re-open their deposition of Bishop in light of his changed answers, then they may file a motion for leave to do so.

---

[1] The court in *Arce* explains why striking deposition errata would be of no practical consequence at trial, 311 F.R.D. at 511.

5

### III. Plaintiffs' Motion for Sanctions

On November 6, 2017, plaintiffs filed a motion to compel discovery (dkt. 14) that defendants opposed (dkt. 23) and on which we held an 80-minute telephonic hearing on November 15, 2017. (*See* Tr., dkt. 56). The court granted the motion in part and denied it in part and, disavowing any intent to micromanage the parties' followup, left it to the parties to follow through, predicting that the longer we talked, the clearer it was becoming to counsel how to make it work. Tr. at 31-33. That turned out to be incorrect, as evidenced by plaintiffs' February 14, 2018 motion for sanctions under Rule 37(b). Dkt. 42. Plaintiffs contend that defendants have failed to provide the information ordered by the court (or failed to confirm that there is none). In response, (dkt. 49) defendants contend that they have substantially complied with their court-ordered discovery obligations but now are being harassed by plaintiffs, who are unhappy that the information they have received does not support their claims. Defendants' point to the court's laissez-faire approach to the followup to argue that the plaintiffs' follow-up demand letter is *not* a court order and therefore cannot be used as a basis for plaintiffs to accuse defendants of not complying with the court's rulings during the November 15, 2018 hearing.

At that hearing, the court observed that the attorneys were working well together, so it would let them sort out and resolve the nuances of the discovery that the court, in broad strokes, was ordering defendants to produce. Regarding plaintiffs' requests for more financial information, the court stated although it rarely ordered disclosure of tax information, plaintiffs were entitled not only to defendants' K-1 Schedules, but any other tax documents upon which defendants were relying in this lawsuit (dkt. 56 at 25-26), and that plaintiffs were entitled to revisit this issue with the court if they thought they needed more, and that there could be exceptions to the court's general policy (*id.* at 27). This segued into the court granting the plaintiffs' request for financial information

related to defendants' R&D processes and expenses (*id.* at 30-34), again with the parties predicting that they would work through the details on their own. The court ordered the production of all executed corporate documents (*id.* at 34-35) and all communications between the defendants and Three Square *id.* at 35-37), and all of the information responsive to the bullet points on pp. 21-22 of plaintiffs' brief, or confirmation that no such documents existed. (*id.* at 37 and 39-40). The court also ordered production of attachments to emails. (*id.* at 42). With input from the parties, the court set December 8, 2017 as defendants' deadline to complete their rolling production of the discovery ordered by the court. *Id.* at 53.

Plaintiff's February 14, 2018 motion for sanctions (dkt. 42) followed, accompanied by a 17 page brief (dkt. 43) and 25 exhibits (dkt. 44). Plaintiffs claim that defendants have violated the court's November 17, 2017 order, and ask the court to designate certain facts to be established, to restrict defendants' actions in this lawsuit, and to impose monetary sanctions. By way of background, plaintiffs outline their claims in this lawsuit, then assert that "defendants deny these allegations but refuse to produce documentation to support their denials or confirm no such documentation exists." Dkt. 43 at 3. Plaintiffs have submitted a copy of their lawyer's November 27, 2018 letter (dkt. 45-11) to defendants' attorney in which they specified the additional discovery they were seeking following the motion hearing. The items listed in the letter mirror the items that the court ordered produced during the hearing. Plaintiffs closed their letter by noting that, although they believed that responsive documents existed for each request, if no responsive documents existed, then defendants should say so. *Id.* at 6. Defendants responded on December 8, 2017 by providing 1055 pages of documents on a disk. Included were defendant Sterling and ART's general ledgers, but little else.

7

According to plaintiffs, these documents lacked substantive compliance with the court's order, and defendants have not supplemented their response since.[2] Plaintiffs list 11 categories of evidence that they have yet to receive from defendants, including corporate records for Sterling, Digital and ART, the financial statements for these companies, executed corporate formation documents, correspondence between plaintiffs and the defendants, licensing agreements, Jim Bishop's employment relationships with Sterling, Digital or ART, documents referenced in emails but not produced, and documents that would support defendants' assertions in their answer, written discovery responses, and deposition testimony. *See* dkt. 43 at 11. Plaintiffs also point to apparent inconsistencies between defendants assertions in some of their discovery responses and other information known to plaintiffs. For instance, Digital claims never to have had any employees, yet Marni Hofer held herself out as VP of sales. Hofer also shows up on ART's direct deposit list and an email from Friedrich to Bishop states that "Selling anything to anyone before we are clear from 3square is very risky. Marin would be involved in the sale and that is even more risky." Dkt. 45-25.

In their 14 page response (dkt. 49), defendants start by gaslighting plaintiffs, characterizing their discovery demands as "rabid," (*id.* at 1) accusing plaintiffs of prematurely demanding evidentiary finality even though discovery continues until July 1, 2018 (*id.* at 2), belittling the quality of plaintiffs' products and services during the parties' business relationship, and characterizing the instant motion as "little more than an ongoing abusive campaign meant to harass and bully Defendants, who have complied with the Court's order in good faith." *Id.* at 2-3.

---

[2] Plaintiffs report that, rather than come back to court immediately, they attempted to develop further information by serving Rule 45 subpoenas on two software companies and three banks known to be working with defendants. Defendants, by counsel, objected to the "witch hunt" but did not file any motions to quash. Instead, the parties have compromised on a narrower scope of the subpoenas. *See* dkt. 43 at 7-8. I surmise that plaintiffs are providing this information simply as background narrative.

More substantively, defendants provide their own gloss of the substantive value of the 1000+ pages they produced on December 8, 2017 and proffer that they have located and provided, or are about to provide additional responsive information. Dkt. 49 at 4-6. Defendants then explain how and why some requested documents are no longer available or never existed. *Id.* at 6-8. As part of this, defendants respond to plaintiffs' request for all documents that support defendants' interrogatory responses by reporting that they answered based on their extensive knowledge and experience in the industry and their recollection of events, "without necessarily referring to or referencing any particular documents." *Id.* at 8. Defendants then state that

> contrary to Plaintiffs' demands, the discovery process is ongoing and it does not serve Defendants' interest nor would it be prudent to attempt to state with any level of conviction that certain documents do not exist at this or any other time, based upon what Defendants state in an interrogatory.

Dkt. 49.

Defendants then offer their view "that there truly is no Court Order to review and enforce in this situation, as the discovery issues were resolved somewhat informally with fairly broad-based oral rulings and without a specific written order being issued." *Id.* Defendants accuse plaintiffs of attempting to contort their November 27, 2017 letter into a legally enforceable order which this court can use as a springboard to impose sanctions. *Id.*

Defendants have got it wrong in several material respects. Starting with the last point, the court's oral rulings during the November 15, 2017 hearing *are* enforceable and the defendants are bound by them. The court's terse written text-only order (dkt. 28) should have put the lie to any post-hearing notion that the 80-minute hearing had been nothing more than a discovery *kaffeeklatsch*. To the extent that plaintiffs' letter to defendants accurately restates what the court ordered, it does

9

not "contort" the court's rulings, it reflects them. And plaintiffs' letter *does* accurately reflect the court's rulings, which I have referred to in this order at 6-7.

As for the timing of plaintiffs' letter, at the hearing, defendants' attorney asked for December 8 as his production deadline, and the court gave it to him. Dkt. 56 at 41. At *that* time, counsel did not express any confusion about what he needed to do in order to comply with the court's order (*id*. at 40), so it is unconvincing for him now to argue that he got jammed up by the timing of plaintiffs' letter. Defendants should have started searching for and gathering the court-ordered materials on November 16, 2018.

Which segues to the court's order that defendants produce everything they possess that is response to the plaintiffs' discovery demands:

> So, Mr. Sandstrom, it's up to you to go back to your clients and say "Look again–check the corners, check the back of the file cabinet–but make sure that everything that we've got is disclosed." And at that point Ms. Knollmaier should be able to be confident that if she doesn't have it, it doesn't exist.
>
> * * *
>
> It's hornbook law that you can't produce what you don't have. But at least you have to check one more time to make sure that everything you do have you have produced.

Dkt. 56 at 34 & 40.

So, defendants had two obligations: look again–harder–and then commit on December 8: this is the rest of what we've got, and there isn't anything else. Defendants now point out that discovery continues for several more months, so it is premature to commit. That argument is a non sequitur in light of the court's order. Plaintiffs are entitled *now* to discover all of the information that defendants possess that is responsive to plaintiffs' discovery requests. If in the future defendants uncover responsive information that they genuinely could not have known today, then they may

supplement as justice requires, but this is not an acceptable excuse for half-hearted discovery responses.

Finally, it is unavailing for defendants to lobby against any of the requested discovery on the ground that plaintiffs' claims are unfounded and that defendants are the injured party here. Those are arguments for motions practice and trial. They are irrelevant to defendants' discovery obligations under the Federal Rules of Civil Procedure. If defendants think plaintiffs discovery demands are improper or disproportionate, then they may file their own motion for protection, but in the instant dispute, that issue was resolved against defendants at the motion hearing.

In the absence of parties' stipulation to extend deadlines, I would assess Rule 37(b) sanctions against defendants today. But their stipulation to some two-month extensions allows the court to give defendants a drop-dead date two weeks from now. April 27, 2018 is the deadline for defendants to provide all of the discovery ordered at the November 15 hearing and to confirm that this is all they have. To be clear, although I am not granting plaintiffs' request for Rule 37(b) sanctions, plaintiffs have prevailed on this motion in all practical respects because the motion flushed defendants' palpable misapprehension of the disclosure obligations this court previously had imposed on them.

**IV. Amending the Schedule**

The court accepts the parties' stipulation (dkt. 61) to extend the expert disclosure deadlines to June 1, 2018 and June 29, 2018 and extend the deadline to file dispositive motions to June 29, 2018. This, however, requires us to move back the October 1, 2018 trial date commensurately to December 3, 2018. If that date does not work for the parties for what they are predicting will be a two week trial, then we can begin trial on January 7, 2019, January 14, 2019 or January 28, 2019.

Not later than April 23, 2018, the parties must report if they have an agreement on one of these proposed new trial dates. If not, then they should report their respective preferences and the court will pick the trial date and reset other dates commensurately.

## V. Cost Shifting

Plaintiffs have asked for cost-shifting on all the aspects of their motions, pursuant to F. R. Civ. Pro. 37(a)(5). "The great operative principle of Rule [37(a)(5)] is that the loser pays." *Rickels v. City of South Bend, Ind.*, 33 F.3d 785, 786-87 (7th Cir. 1994). Here we have a mix: plaintiffs have won the AEO re-designation motion and the sanctions motion but lost the errata motion on a technicality as currently framed, which means that this motion was substantially justified. *See* Rule 37(a)(5)(B). Plaintiffs may have until April 23, 2018 to file an itemized list of costs incurred on its winning motions. Defendants may have until April 30, 2018 to respond.

## ORDER

It is ORDERED that:

(1) Plaintiffs' motion (dkt. 14, Part 4) to require defendants to amend their AEO designations is GRANTED. Defendants may have until April 23, 2018 to provide further information on the subset of documents identified in the body of this order.

(2) Plaintiffs' motion (dkt. 38) to strike Jim Bishop's errata sheet is DENIED.

(3) Plaintiffs' motion (dkt. 42) for sanctions under Rule 37(b) is GRANTED IN PART and DENIED IN PART in the manner and for the reasons stated. Defendants' deadline to finalize their court-ordered discovery disclosures is April 27, 2018.

(4) The parties' stipulation to amend the schedule (dkt. 61) is ACCEPTED. Plaintiffs' deadline to disclose experts is moved to June 1, 2018, defendants' deadline to disclose experts is moved to June 28, 2018, and the deadline to file summary judgment motions is moved to June 29, 2018. Not later than April 23, 2018, the parties must report their preferences on the new trial date.

(5) Plaintiffs' motions for cost-shifting are GRANTED IN PART and DENIED IN PART. Plaintiffs have until April 23, 2018 to submit their itemized list of costs and expenses. Defendants have until April 30, 2018 to respond.

Entered this 13th day of April, 2018.

BY THE COURT:

/s/

STEPHEN L. CROCKER
Magistrate Judge